**YAMASHITA–SHINNIHON KISEN, K.K. TOKYO, Plaintiff-Appellee,**

v.

**W. J. JONES & SON, INC., Defendant-Appellant.**

No. 71-2347.

United States Court of Appeals,
Ninth Circuit.

Feb. 16, 1973.

Jerard S. Weigler (argued), Robert E. Babcock, of Lindsay, Nahstoll, Hart, Duncan, DaFoe & Krause, Portland, Ore., for defendant-appellant.

Paul N. Wonacott (argued), of Wood, Wood, Tatum, Mosser & Brooke, Portland, Ore., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and LINDBERG,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Atterbury, a longshoreman employed by W. J. Jones & Son, Inc., was injured in the course of stevedoring operations abroad a vessel owned by Yamashita-Shinnihon Kisen, K.K. His civil action charged Yamashita with negligence and with unseaworthiness of the vessel. Yamashita sued Jones in a separate indemnity suit, alleging Jones' negligence [1] and breach of its *Ryan* [2] warranty of workmanlike performance (WWLP).

Jones counterclaimed against Yamashita, by way of set off or recoupment, for that part of any indemnity judgment in favor of Yamashita, proximately resulting from Yamashita's breach of its obligations to Jones. Jones alleged that Yamashita breached (1) its *Marine Terminals* [3] obligation; (2) an implied contractual obligation; and (3) an express contractual obligation.

Yamashita settled with Atterbury for $25,000, and the trial upon which this appeal is based ensued. We must describe in some detail the circumstances surrounding Atterbury's injury.

He was injured in the course of helping to lower a boom aboard ship. Attached to the boom was a topping lift wire which ran through a hangar winch. Attached to the end of the topping lift wire was a smaller, pigtail wire, designed to be attached to the warping end of a cargo winch which, in turn, supplied the power to lower and raise the boom.

Both winches were placed on a small platform about 12 feet above the main aft deck. The hangar winch was flush against a derrick post from which the boom was suspended and the cargo

---

* Of the Western District of Washington.

1. The negligence count was dropped prior to submission of the case to the jury.

2. Ryan v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 99 L.Ed. 641 (1956).

3. Federal Marine Terminals v. Burnside Shipping Co., 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

winch was at least several feet away. A winch platform guardrail was approximately 28 inches beyond the cargo winch.

The pigtail wire could be utilized in different ways in the lowering of the boom, depending on whether it had a hook on its end. The hook could be inserted in the warping end of the cargo winch and the slack taken from the pigtail line by engaging the cargo winch. A longshoreman standing between the two winches would feed the pigtail line into the cargo winch until the slack was taken up.

Without a hook on the end of the pigtail line, a common longshoring practice was to wrap the middle of the line around the cargo winch, requiring a longshoreman to stand in the 28-inch space to feed the pigtail wire onto the cargo winch during the lowering operation.

Atterbury was using the latter technique but without an assistant tending the pigtail line behind him to take any kinks out of it. He was injured when one hand was caught in the cargo winch as he fed the pigtail line onto the warping end.

The trial judge instructed the jury that either of two findings would require a verdict for Yamashita, unless the jury found conduct on the part of Yamashita which prevented, interfered with, or seriously handicapped Jones from doing a workmanlike job. Those two findings were either (1) that the pigtail line that Atterbury was using was equipped with a hook, and that the

failure to use the hook constituted an unsafe stevedore practice which caused Yamashita to be liable for Atterbury's injuries; or (2) that the failure to provide a fellow longshoreman to tend the line for Atterbury constituted an unsafe stevedore practice causing Yamashita to be liable for Atterbury's injuries.

Jones requested an instruction on its counterclaim. The trial judge denied it on the ground that the essence of the counterclaim had been presented to the jury in the form of the affirmative defense. Jones asked for a jury instruction, also refused, that an apportionment of the damages was possible. The jury returned a verdict in favor of Yamashita for the full amount of the Atterbury settlement.

This case represents the latest twist in the *Sieracki-Halcyon-Ryan-Italia-Marine Terminals* [4] dispute between stevedores and shipowners as to who should bear the economic burden of an injury to a stevedoring longshoreman. Briefly, the background:

Under the Longshoremen's and Harbor Workers' Compensation Act,[5] the employer is held strictly liable to the injured longshoreman and, in exchange, benefits by a damages ceiling. However, either the employee or the assignee-employer may hold liable negligent third parties. In *Sieracki*, a longshoreman employee of a stevedore injured while loading a ship sued the shipowner, claiming unseaworthiness. The Court held that the shipowner's warranty of seaworthiness [6] extends to such a

4.  Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); Ryan v. Pan-Atlantic, *supra*; Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Federal Marine Terminals v. Burnside Shipping Co., *supra*.

5.  44 Stat. 1424 *et seq.*, as amended, 33 U.S.C. § 901 *et seq.*

6.  The concept of seaworthiness, which originally pertained only to the condition of the ship and its equipment, has been expanded almost without limit. *See* Italia Societa v. Oregon Stevedoring Co., *supra;* Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Simpson Timber Co. v. Parks, 369 F.2d 324 (9th Cir. 1966), remanded mem., 389 U.S. 909, 88 S.Ct. 210, 19 L.Ed.2d 227 (1967), aff'd in part, 390 F.2d 353 (9th Cir. 1968); D/S Ove Skou v. Herbert, 365 U.S. 341 (5th Cir. 1966).

**850**

stevedoring longshoreman.[7] The shipowner, however, did not have the benefit of limited liability, as did the stevedore-employer under the statutory scheme.

Then in *Halcyon* the Court held that the shipowner could not seek contribution from the stevedore for liability that the shipowner might incur as a result of the ship's unseaworthiness. As a result the full brunt of the economic consequences of the longshoreman's injury remained with the shipowner.

But in *Ryan, Halcyon* was held to be no bar to the shipowner recovering full indemnity from the stevedore, should the latter breach its implied contractual warranty to perform its work in workmanlike fashion. The Court distinguished *Halcyon* by noting that *Ryan* did not involve a claim for contribution from a joint tortfeasor, as did *Halcyon*.

■ Subsequent cases expanded the scope of the stevedore's implied contractual warranty to supply workmanlike service,[8] and as a result the economic impact of the longshoreman's injury shifted to the stevedore-employer. In fact, if the stevedore renders a substandard performance, the shipowner is entitled to indemnity "absent conduct on its part sufficient to preclude recovery." Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct.

438, 441, 2 L.Ed.2d 491 (1958) (dictum). Few courts have found shipowner conduct sufficient to preclude recovery.[9]

■ It has generally been established that the determination of whether the stevedore-employer should be required to indemnify the shipowner involves a weighing process evaluating the conduct of both parties to determine: (1) whether the *Ryan* WWLP was breached; (2) whether that breach proximately caused the injury; and (3) whether the shipowner's conduct prevented the workmanlike performance. Garner v. Cities Service Tankers Corp., 456 F.2d 476 (5th Cir. 1972). The shipowner has generally recovered either full indemnity or none at all, *Halcyon* being read as barring apportionment of the damages.[10]

Were this case before us in the context of the sufficiency of the evidence to support the jury's verdict granting Yamashita full indemnity, the issue would not be difficult. But Jones does not appeal the jury's verdict granting Yamashita full indemnity. Properly so, for it is clear that under the present state of the law we would have to affirm the jury's determination.

Jones has claimed that Yamashita was negligent and breached its implied warranty obligations in that there was excessive grease on the topping lift wire;

7. The Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (Act of October 27, Pub.L. No. 92-576, 86 Stat. 1251) abolish any liability of the vessel under the warranty of unseaworthiness. These amendments, however, were not in effect at the time of the injury to Atterbury.

8. *See, e. g.*, Italia Societa v. Oregon Stevedoring Co., *supra* (Breach of the *Ryan* warranty found even when the stevedore was not negligent.)

9. Even negligent shipowners have been granted indemnity. *See, e. g.*, Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); Crumady v. The Joachim Hendrik Fisser, *supra;* Frasca v. S/S Safina E. Ismail, 413 F.2d 259 (4th Cir. 1969); Pettus v. Grace Line Inc., 305 F.2d 151 (2d Cir. 1962); Drago v. A/S Inger, 305

F.2d 139 (2d Cir.), cert. denied 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962).

10. But see In Re Seaboard Shipping Corp., 449 F.2d 132 (2d Cir. 1971), cert. denied 406 U.S. 949, 92 S.Ct. 2039, 32 L. Ed.2d 337 (1972); Watz v. Zapata Off-Shore Co., 431 F.2d 100 (5th Cir. 1970); Horton & Horton, Inc. v. T/S J. E. Dyer, 428 F.2d 1131 (5th Cir. 1970), cert. denied sub nom. Horton & Horton, Inc. v. Vaughan Marine, Inc., 400 U.S. 993, 91 S.Ct. 46, 27 L.Ed.2d 441 (1971) (limiting *Halcyon* to cases where the joint tortfeasor against whom contribution is sought is immune from tort liability by statute); *contra*, In re Standard Oil Co. of California, 325 F.Supp. 388 (N.D.Cal. 1971). *See generally* Allbritton, "Division of Damages in Admiralty—A Rising Tide of Confusion," 2 Journal of Maritime Law and Commerce 323 (1971).

the topping lift wire had loose strands and splinters; the winch platform was too small to allow Atterbury to work in safety and the winch was not guarded, or was inadequately guarded. Additionally, Jones claims that Yamashita breached its express contractual promise to furnish and maintain "suitable booms, winches, blocks, and falls."

■ The cases clearly state that a shipowner is entitled to indemnity from a stevedore in breach of its *Ryan* warranty, absent conduct on the shipowner's part sufficient to preclude recovery. Even a breach of the stevedoring contract by the shipowner has been held insufficient to preclude recovery, where the stevedore knew of the breach and continued using defective equipment supplied by the shipowner. Matson Terminals, Inc. v. Caldwell, 354 F.2d 681 (9th Cir. 1965) (defective winches).

Jones' claim simply stated, is that Yamashita furnished defective equipment for Jones to use. While, if true, that might establish a breach by Yamashita of its obligation to Jones, whether under contract or otherwise, here the evidence is sufficient to support a jury determination that Jones waived that breach when it continued to use the defective equipment knowing of the defect. Therefore, were this before us as an appeal from a jury verdict granting full indemnity, we would affirm.

Jones, however, is appealing from the trial court's refusal to let its counterclaim go to the jury. While some have suggested that perhaps the rule should be otherwise,[11] it is clear that prior to 1969 no court of appeals had allowed a stevedore to submit a counterclaim to the jury in situations such as this.[12] Then in 1969 the Supreme Court decided Federal Marine Terminals v. Burnside Shipping Co., *supra*.

In *Federal Marine Terminals*, an employee of a stevedore was killed and his widow recovered an annuity potentially worth $70,000 from the stevedore under the Longshoremen's and Harbor Workers' Compensation Act. The widow sued the shipowner for wrongful death under an Illinois statute which limited the amount recoverable to $30,000. The shipowner then sued the stevedore for indemnification, alleging a breach of the *Ryan* WWLP. Stevedore counterclaimed against the shipowner for $70,000, the entire amount of the stevedore's liability under the Act. The district court granted shipowner's motion to dismiss the counterclaim, and an appeal ensued, before any determination was made on the merits of the shipowner's *Ryan* claim.

The Supreme Court set aside the action of the district court, holding that the counterclaim was proper. The Court held that federal maritime law does impose on the shipowner a duty to the stevedoring contractor to exercise due care under the circumstances, and does recognize a direct action in tort against the shipowner to recover the amount of compensation payments occasioned by the latter's negligence.

The Court also refused to preclude the possibility of a direct action by the stevedoring contractor based on express or implied contractual warranties. The Court further noted that at the stage of the case as presented they must assume that the stevedore was faultless vis-a-vis the shipowner, since the claim that stevedore breached its *Ryan* WWLP had not yet been adjudicated and was not before the Court. The Court added the further caveat that it decided nothing with respect to the interaction between the shipowner's breach of warranty claim and the stevedoring contractor's tort claim. *A fortiori*, the Court decided

11. D/S Ove Skou v. Herbert, n. 18, p. 351 of 365 F.2d; Clark, J., dissenting in Pettus v. Grace Line Inc., 155 of 305 F.2d (2d Cir. 1962).

12. See Proudfoot, "The Tar Baby": Maritime Personal-Injury Indemnity Actions, 20 Stan.L.Rev. 423, 422–445; McLaughlin v. Trelleborgs Angfartygs A/B, 408 F. 2d 1334 (2d Cir.), cert. denied sub nom. Golten Marine Co. v. Trelleborgs Angfartygs A/B, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969).

nothing with respect to the interaction of the shipowner's *Ryan* claim and the stevedore's express or implied contractual warranty claim.

That interaction is before us today. Jones asserts that the logical outcome of these interacting claims must be that each party is to bear such portion of the loss as is attributable to its respective breach of duty.

We disagree. We do not believe that in granting stevedore a right of action on a counterclaim the Court intended to depart from the long line of cases which have held that the shipowner, absent conduct on its part sufficient to preclude recovery, is entitled to full indemnity from the stevedore when the stevedore breaches its *Ryan* warranty.

The Supreme Court has recognized that the objective of the doctrine of unseaworthiness and the corollary doctrine of indemnification is "to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents." [13] The Court has further acknowledged that the function of these special rules is allocation of the losses caused by shipboard injuries to the enterprise

> "best situated to adopt preventive measures and thereby to reduce the likelihood of injury. Where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not." [14]

■ We feel that these objectives are furthered by our holding today placing the burden ultimately on the company whose default caused the injury.[15] The jury found that a proximate cause of the accident was an unsafe stevedoring practice employed by Jones. Jones alleges that defective equipment was also a cause. But the allegedly defective nature of the equipment would have been ascertainable upon even the most cursory of inspections. Jones, using the equipment daily, was in the best position to discover any defect and to have it remedied. Under these circumstances, we see no reason, even assuming that *Halcyon* is no bar, to formulate judicial rules of apportionment.[16] We hold that Jones' counterclaim to Yamashita's indemnity suit did not entitle Jones to an apportionment of damages.

We find nothing in *Marine Terminals* to indicate otherwise. The Court there expressly noted that the stevedore was not seeking contribution "[r]ather the counterclaim seeks recovery of the full amount of [stevedore's] liability under the Act to [the employee's] representative." [17] Under the guise of a counterclaim, Jones now seeks an apportionment of the damages. We find no support for such an apportionment under the facts of this case.

Jones contends that having created "The Devil's Own Mess," [18] federal courts can no longer "abstain from further adventures in this wonderland." [19] In *Halcyon*, the Supreme Court concluded that the problem was best suited for Congressional solution:

> "We have concluded that it would be unwise to attempt to fashion new judicial rules of contribution and that the solution of this problem should await *congressional action*.

13. Italia Soc. v. Ore. Stevedoring Co., 324 of 376 U.S., 754 of 84 S.Ct.

14. Id. at 324, 84 S.Ct. at 754; Stranahan v. A/S Atlantica & Tinfos Papirfabrik, 471 F.2d 369 (9th Cir. 1972).

15. Italia Soc. v. Ore. Stevedoring Co., 324 of 376 U.S., 84 S.Ct. 748; Reed v. The Yaka, 373 U.S. 410, 414, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963).

16. *Cf.* Atlantic Coast Line Railroad Co. v. Erie Lackawanna Railroad Co., 406 U.S.

340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972). (Halcyon reaffirmed.)

17. Federal Marine Terminals v. Burnside Shipping Co., 418 of 394 U.S., 1152 of 89 S.Ct.

18. Currie, Federalism and the Admiralty, "The Devil's Own Mess," The Supreme Court Rev. 158, 212–213 and 220–221 (1960).

19. Judge Friendly in McLaughlin v. Trelleborgs Angfartygs A/B, 1338 of 408 F.2d.

. . . Many groups of persons with varying interests are vitally concerned with the proper functioning and administration of [Acts dealing with maritime personal injuries]. We think that legislative consideration and action can best bring about a fair accommodation of the diverse but related interests of these groups. The legislative process is peculiarly adapted to determine which of the many possible solutions to this problem would be most beneficial in the long run." Halcyon at 285–286 of 342 U.S., at 280 of 72 S.Ct.

These considerations seem equally applicable today, especially in light of Congress' recent attempt to "bring about a fair accommodation of the diverse but related interests of these groups."[20]

We hold that the trial judge did not err in refusing to instruct the jury that an apportionment of damages was proper.

■ The trial court's disposition of Jones' counterclaim remains to be dealt with. The trial court concluded that the essence of Jones' counterclaim was presented to the jury as an affirmative defense. We agree. Jones had the burden of proof on its defense, just as it would have had on its counterclaim, had it been submitted to the jury. The jury's finding that Yamashita was not guilty of "conduct sufficient to preclude recovery" necessarily implies a finding that Jones would not have been entitled to recover on its counterclaim. Under these unique circumstances, Jones was not prejudiced by the trial court's refusal to submit its counterclaim to the jury.

Yamashita raises a further issue, the sufficiency of the evidence to enable Jones' counterclaim to go to the jury. The trial judge did not address himself to this question in disposing of the counterclaim, and our treatment of the matter precludes the necessity of considering the issue on appeal.

The decision of the trial court is affirmed.